**In the Matter of MICHIGAN AVENUE NATIONAL BANK, as Trustee under Trust # 2214, Debtor.**

**Marion AUGUST, Plaintiff,**

**v.**

**MICHIGAN AVENUE NATIONAL BANK, as trustee under Trust # 2214, Defendant.**

**Bankruptcy No. 77 B 5306.**

United States Bankruptcy Court, N. D. Illinois, E. D.

Jan. 11, 1980.

Gerald M. Munitz, Nachman, Munitz & Sweig, Rosenthal & Schanfield, Chicago, Ill., for plaintiff.

Ronald M. Brown, Chicago, Ill., for debtor.

## OPINION AND ORDER

RICHARD L. MERRICK, Bankruptcy Judge.

### SYNOPSIS

Because the legal principles at issue in this case are so far reaching they will be discussed before the facts are described in any detail. The principal issue in the case is whether the mortgagor or the mortgagee is entitled to residual rents collected during the administration of a Chapter XII proceeding subsequently dismissed for failure to file a plan. Illinois law governs all aspects of the case not controlled by federal law. The principal applicable Illinois statute was adopted August 7, 1961, has not been construed in any reported relevant decision, and is entitled:

"AN ACT in relation to the rights of mortgagees and other persons empowered to take possession of mortgaged real estate after default and the enforcement of such rights by the Courts of this State." [1]

### THE MORTGAGE INSTRUMENT

The case comes on for decision as a matter of first impression in two separate respects. In the first place there is no reported case which construes the governing statute. In the second place there is no reported Illinois case which determines the possessory rights of a mortgagee where the mortgage document has not been a deed.

The actual mortgage document at issue in the instant case is described where relevant

---

1. 1977 Ill.Rev.Stat. Ch. 95, Secs. 22b.51–22b.62.

in the footnotes. All of the Illinois cases considering the relative rights of a mortgagor and a mortgagee to rents after default arose in a different era when the conventional mortgage instrument was an absolute deed in fee, subject to defeasance upon timely payment of the debt secured. (Some of the cases centered around a trust deed, and in others the document was not described).

The present mortgage instrument describes itself as a "MORTGAGE". The grantor is described throughout as "MORTGAGOR", and the grantee is described throughout as "MORTGAGEE." The granting clause reads in pertinent part as follows:

> "That to secure the payment of the principal of and interest and premium, if any, on the Note . . . and to secure the payment of all other Indebtedness Hereby Secured . . . the Mortgagor does hereby GRANT, RELEASE, REMISE, ALIEN, MORTGAGE and CONVEY unto the Mortgagee all and sundry the property . . ."

Clause 20 describes the interest of the mortgagee as a "lien." Clause 28 speaks of title in the Mortgagor, and clause 30 speaks of the Mortgagor as record owner of the premises.[2]

There are words in the document that have the ring of an outright conveyance; there are other words that have a security interest connotation. Before the Court can approach the question of whether the Mortgagor or the Mortgagee is entitled to any residual net rents collected during the period of administration under Chapter XII but not expended at the time of the dismissal, the Court first must establish whether the mortgage document conveyed to the Mortgagee legal title or only a security interest.

Bearing in mind that the traditional historical mortgage instrument in Illinois, as in England, was an absolute deed in fee, subject to defeasance upon prompt payment of the debt, we may weigh the title factors and the lien factors. On the scale pan favoring title there are:

(a) in the conveyance clause the words "GRANT" and "CONVEY",

(b) in the quantity clause the words ". . . any and all rights and interests of every name and nature now or hereafter owned by the Mortgagor . . ."

(c) and the qualifying words, ". . . the express condition that if all of the Indebtedness Hereby Secured shall be duly and punctually paid . . . then this Mortgage and the estate, right and interest of the Mortgagee in the Premises shall cease and become void and of no effect."

On the scale pan favoring lien are:

(a) the document is called a "Mortgage",

(b) the grantor is called a "Mortgagor",

(c) the grantee is called a "Mortgagee",

(d) the words "RELEASE", "REMISE", "ALIEN", and "MORTGAGE" appear alongside "GRANT" and "CONVEY",

(e) the phrase "Indebtedness Hereby Secured" runs throughout the document,

(f) the Mortgagor retains possession,

(g) the document is a Security Agreement for the purpose of the Uniform Commercial Code, respecting the associated personal property,

(h) the Mortgagor remains the owner of the associated personalty—it was not sold to the Mortgagee,

(i) the interest of the Mortgagee is described as a lien,

---

2. Clause 20. "Foreclosure. When the Indebtedness Hereby Secured, or any part thereof, shall become due, whether by acceleration or otherwise the mortgagee shall have the right to foreclose the lien hereof for such indebtedness or part thereof. In any suit or proceeding to foreclose the lien hereof . . ."

Clause 28. "Title in Mortgagor's Successors. In the event that the ownership of the Premises becomes vested in a person or persons other than the mortgagor . . ."

Clause 30. "Successors and Assigns. This mortgage and each and every covenant, agreement and other provision hereof shall be binding upon the mortgagor and its successors and assigns (including, without limitation, each and every from time to time record owner . . ."

(j) title remains in the Mortgagor,

(k) the Mortgagor and his successors are referred to as "record owner".

From the foregoing the Court finds that the intent of the parties was to convey a security interest only in the premises to the Mortgagee. The Court also finds that the form of the document is a mortgage and not a deed. As such, it is different from the forms of conveyance which have been the subject of all of the relevant reported cases which have come to the attention of the Court. All of the Illinois cases which deal with the mortgagee's rights to rents turn in part on the theory that the Mortgagee, or the trustee acting on his behalf, holds title to the property.

## HISTORICAL BACKGROUND

"There is perhaps no species of ownership known to the law which is more complex, or which has given rise to more diversity of opinion, and even conflict in decisions, than that which has sprung from the mortgage of real property."[3]

Like the warp of a fabric which has been overlain with ornamentation, the logic of current mortgage law is seldom discernible because it has become encrusted with customs and procedures which are unrelated to the simple economic transaction of borrowing money and placing an interest in the land as security for the repayment of it. But starting from a rudimentary beginning one can find a continuity through the rigidity of the forms of action and common law pleading and the intricacies of feudal tenure. A recital of the essential facts in this case will follow a tracing of 900 years of evolution of the real estate mortgage in the Anglo-American tradition.

Many of the treatise writers describe as the origin of real estate mortgages methods and rules of law which were in effect in the latter part of the fourteenth century.[4] Contemporary decisions frequently do the same thing, which complicates a comprehension of the basics for two reasons:

(a) it passes over the importance which the laws prohibiting usury had in the formative period of the eleventh, twelfth and thirteenth centuries and the devices which were used to circumvent those laws, and

(b) it creates the impression that feudal tenure concepts were the chassis of real estate mortgages, whereas they are only the body which is seen and obscures the functioning parts.

For purposes of simplification the subject of usury will be considered separately and not chronologically.[5] The original meaning of usury was a charge for the use of something—any charge, there was not at the beginning any connotation of excess charge. Usury is prohibited in the Bible in a number of places,[6] and during the medieval period fear of excommunication or other censure by the ecclesiastical courts was a greater deterrent than was the civil penalty of confiscation of all of the property of the usurer (not just a forfeiture of the principal of the loan in question).[7] Historians of the Crusades, which were being conducted intermittently during this period, suggest that

---

3. *Barrett v. Hinckley*, 124 Ill. 32, 41, 14 N.E. 863, 865 (1888).

4. Pomeroy, *Equity Jurisprudence*, § 1179, 5th Ed. Bancroft Whitney Company (1941); Tiffany, *Real Property*, § 1379, 3d Ed. Callaghan and Company (1939); Kratovil, *Real Estate Law*, § 370, 6th Ed. Prentice Hall, Inc. (1964).

By way of contrast see:
*Jones on Mortgages*, § 7, 8th Ed. Bobbs-Merrill Company (1928); G. Osborne, *Handbook on the Law of Mortgages*, §§ 1–4, 2d Ed. West Publishing Co. (1970); Thompson, *Real Property*, § 4650, Bobbs-Merrill Company (1958).

5. Benjamin Nelson, *The Idea of Usury*, 2d Ed., Univ. of Chicago Press (1969).

John T. Noonan, *The Scholastic Analysis of Usury*, Harvard Univ. Press (1957).

6. Exodus 22:25; Leviticus 25:36 and 37; Deuteronomy 23:19 and 20; Ezekiel 18:8; Luke 6:35.

7. It has been suggested that civil enforcement of the laws against usury was about the equivalent of enforcement of the Volstead Act in the 1920's and early 1930's. Interest was first authorized in 1545 with a maximum rate of 10%; 7 Hen. VIII, c.9 (1545).

the principal secular motivation for prohibiting usury was to enable the kings to finance the Crusades, which they could not have afforded if they had had to pay interest on their borrowings.[8]

The most significant of the Biblical prescriptions against usury is Deuteronomy,[9] which created the rancor which has existed between Christians and Jews for 1500 years because it was interpreted by all but the most orthodox of Jews as permitting the charging of interest by Jews to all persons except Jews. The Christian tenet that it was a universal church to which all might belong caused its theologians to prohibit Christians from charging interest to anybody. The doctrine went that there were no enemy of the Christians who might be charged because all mankind were brothers. It appears that the religious sanctions against Jews for lending to other Jews at interest were not severe, because the practice had become wide spread by the Middle Ages. There are indications that many Jews in that period considered usury to be relative and not absolute and that modest interest was not disapproved.

In dealing among themselves the Jews used a wide variety of conditions, bonds, forfeits, penalties, part payments, specific liquidated damages and a type of sale and lease-back to bury the fact that a charge was being made for the use of money.[10] Among themselves in mortgage lending they used a method which became the principal method in their dealing with Christians as well.[11] Two instruments were used. An absolute charter of feoffment was executed by the borrower in favor of the mortgagee. An instrument of defeasance was executed by the mortgagee. Until maturity, both documents were held by a stake holder, frequently the treasury of the Knights Templar, or they were recorded in the Jewish Exchequer. Either way the mortgagee was protected even though the mortgagor remained in possession.

During the thirteenth century the Lombards displaced the Jews as financiers of the nobility, while the Jews continued to finance the middle classes. With interest rates running between 40% and 50%,[12] one lending group was as scorned as the other, but the Lombards [13] were less visible because there were fewer of them and they were largely itinerants. The expulsion of Jews from England by Edward I in 1290 provided a scapegoat to appease the middle classes without disrupting the finances of the nobility.[14] It did, however, terminate the Jewish Exchequer and a systematic recording of mortgages. In the twelfth century hypothecations of lands and chattels had been memorialized by recordings in monasteries and abbeys; on a piecemeal basis this continued.

Similarities between the Germanic law and the Saxon law which parallel other similarities between Norman law and Anglo-Saxon law suggest that Civil Law principles governed the early mortgage procedures in England and on the Continent and that regardless of form the intent of the

---

8. Pope Innocent III was particularly vehement about eliminating usury in his exhortations to the kings.

9. Deut. 23:19. "Thou shalt not lend upon usury to thy brother; usury of money, usury of victuals, usury of anything that is lent upon usury."
   23:20. "Unto a stranger thou mayest lend upon usury; but unto thy brother thou shalt not lend upon usury." (underscoring supplied).

10. Jacob J. Rabinowitz, *The Story of the Mortgage Retold*, 94 U. of Pa.L.Rev. 94–109 (1945).

11. Jacob J. Rabinowitz, *The Common Law Mortgage and The Conditional Bond*, 92 U. of Pa.L.Rev. 179–194 (1943).

12. Sidney Homer, *A History of Interest Rates*, Rutgers University Press (1963).
   Those were annualized rates for short term loans unsecured or secured by personal property, frequently expressed as rate per week or month. Long term real property mortgage loans would have been less, probably in the 20% range.

13. Why the citizens of Asti and Chiari, in particular, were less concerned about excommunication than other Christians is not clear.

14. L. F. Salzman, *Edward I*, Frederick A. Praeger (1968).

parties was to create a security interest in the land in favor of the lender.[15] What probably had a greater influence in causing a dominance of Civil Law concepts in the early English mortgage law was that the language of the courts was Latin, and most of the lawyers and judges were or had been Roman Catholic priests.[16] Until near the end of the twelfth century the only writings available for lawyers to study were manuscript dissertations on Roman law. The first analysis of the Common Law was Glanville's "A Treatise of the Laws and Customs of England", written about 1181 in Latin. Also in Latin was Bracton's "On the Laws and Customs of England", written about 1250. The first law book not written in Latin was "Littleton on Tenures" written in Law French and published in 1481 as the first printed English law book. Thus it was that persons with considerable background in the Civil Law were predominant in shaping early Common Law.

In early English law a pledge was a "gage" (*vadium*).[17] If the lender held the security, it was a pawn. If the borrower held the security, it was a hypothecation. One form of gage was the living gage (*vivium vadium*) under which by agreement the rents and profits were used to reduce the debt. Another form of gage was the dead gage (*mortium vadium*) under which the rents and the profits were not used to reduce the debt but rather were payed to the lender in lieu of interest. Although the dead gage was not as common as the living gage, it is the source of the term mort gage, or mortgage, which came to be used to describe the gamut of real and personal property pledges now commonly referred to as mortgages and chattel mortgage. The dead gage was one of the methods that the Christians used in an attempt to avoid the usury laws, but they were subject to excommunication and confiscation of all property if caught.

It would appear that in the early gages the value of the land was roughly the equivalent of the amount of the debt. Upon termination of the gage the creditor would be entitled to the land if the debt had not been paid, to be achieved by forfeiture or sale. There was no personal liability on the part of the borrower if the value of the land happened to be less than the amount of the debt, nor was there any surplus payable to the borrower if the value of the land exceeded the amount of the debt. To use the idiom of a different era, that was the luck of the draw. The concept of a personal liability for the debt did not develop for about 100 years. At the outset a creditor would lend no more than he thought that the land was worth, or would be worth at the end of the agreed term.

Two types of gage which were used in the twelfth and thirteenth centuries grew into disuse as the formalities and technicalities of feudal tenure began to be observed more closely, form began to be put ahead of substance. A short explanation of "seisin" may expedite the exposition of different kinds of gages.

Theoretically, after the Convocation at Salisbury in 1085 William the Conqueror (and his successors as kings) owned all of the land in England. The lords, who were tenants of the king, had sub-tenants, *ad infinitum*, each of whom owed fealty to his superior, up to the sovereign. The modern equivalent of ownership was a tenancy in fee simple (A and his heirs), the second degree of ownership was a tenancy in fee tail (A and the heirs of his body), and the third was an estate for life (A for life). These three estates were freehold estates, and possession of a tenancy in freehold constituted seisin. Various rights and privileges were associated with seisin, but the one which is significant for mortgage purposes is that only a person who was seised of a freehold could maintain an action of ejectment, and ejectment was the form of action

**15.** H. W. Chaplin, *The Story of Mortgage Law,* 4 Harv.L.Rev. 1–14 (1890).

**16.** The Church of England was not split off from Rome until 1534.

**17.** H. D. Hazeltine, *The Gage of Land in Medieval England*, Part I, 17 Harv.L.Rev. 549–557 (1904); Part II, 19 Harv.L.Rev. 36–50 (1904).

by which were determined ownership and right to possession of land.

The gage in which the creditor took possession by agreement with the borrower came into disfavor because the creditor was not seised of the property and under the forms of action could not enforce his right to possession against a third party. Thus the gagee was dependent upon the gagor to assert his own seisin to dispossess the third party, an arrangement under which the gagee could not control his own destiny.

The other type gage which fell into disuse because of the conveyancing technicalities of feudal tenure was one in which the borrowing owner would pledge the property to the lender for a term of years with a provision in the contract that upon default the pledgee's interest by mere force of the contract would be converted into a fee and become absolute. This might have solved the practical problem of seisin, but it contained the theoretical flaw that it constituted a springing freehold interest. A variation in which the owner would convey the property in pledge to the lender for a term of years with a remainder to the grantor on payment of the debt was technically faulty because it provided for a contingent remainder after a term of years; also it did not solve the matter of seisin. Principles of feudal tenure required that at the end of every chain there had to be a vested interest in fee.

The problems respecting a mortgagee's ability to defend his possession were solved by use of a deed upon condition, variously called a defeasible fee, or a base fee, or a determinable fee, or a fee on condition broken, or a fee subject to a condition subsequent. Land was conveyed to the creditor in fee, accompanied by livery of seisin, on the condition that the conveyance be void if the debt should be paid promptly upon maturity, otherwise to stand absolute.[18] This became the form of mortgage used generally in England and in the United States for the ensuing 500 years.[19] Most of the treatises read as though it continues to be the principal form in use, which is highly doubtful. It was not the form used in the instant case.

In the early gages described above where the debt was the functional equivalent of the value of the land, possession of the land always passed to the creditor, who would become owner of the land if the debt should not be paid. When the form of mortgage became an absolute deed, a transfer of possession was required because under feudal concepts a conveyance was not complete without livery of seisin. Probably before 1300 it had become established that in a living gage the rents had to be used to reduce the debt, so that as between themselves it was not particularly important whether the mortgagor or the mortgagee had possession. The profits of the land were applied in the same manner in either event. In a dead gage the mortgagee reduced his risk of getting caught for usury if he maintained possession.

In any event from about 1300 to 1550 the normal method in use was for the mortgagee to be in possession during the term of the mortgage. A shift began in the reign of Elizabeth, which was well developed by 1600 and practically completed by the Restoration in 1650 of having the mortgagor retain possession. By then many of the mortgagees felt that the burdens of responsibility for the rents outweighed the benefits of the slight additional security which possession gave to them.

Although the courts of law had recognized the true nature of the mortgage as a

18. Rabinowitz suggests that the use of an absolute conveyance in what was essentially a conditional transaction was derived from a Jewish counterpart designed to cope with the doctrine of "Asmakhta", which made conditional transfers invalid under Talmudic law. The use of an outright conveyance by the pledgor accompanied by a document of defeasance by the pledgee eliminated the conditional element from the visible surface of the pledge. Op.Cit. Note 11, supra.

19. By 1400 it was common to have a single instrument, with the conveyance written on the front side and the defeasance on the back. By 1450 the defeasance was also on the face of the deed. By 1500 the conveyance and the defeasance were both made by the grantor.

security interest as early as 1314,[20] later in that century and throughout the 1400's and 1500's the law courts were becoming increasingly entangled by trying to express in terms of feudal tenure what was a very simple concept under the Civil Law, namely, that the mortgagee had a security interest and that the mortgagor was the owner for all purposes not inconsistent with the security interest. The parol evidence rule caused the law courts a great deal of trouble because frequently the substantive condition was the opposite of the formal appearance. The forms of action presented problems because the action of ejectment was too narrow in its scope to handle many of the questions which arose. The law courts' biggest problem, however, was in attempting to maintain the symmetry which was the keystone of feudal tenure.

Most of the cases which arose in the law courts were not controversies between the mortgagor and the mortgagee but were public issues involving one or the other of them and third parties. Did the mortgagor or the mortgagee have the right to vote where the franchise was based upon ownership of a freehold? Which of them would have the right to hunt where the hunting privilege was based upon owning a freehold? Would the widow of the mortgagor or of the mortgagee have a dower interest in the land? Would the interest of the mortgagee pass to his heirs or to his next of kin? By a fairly good margin most of these public issue cases arrived at the result that the mortgagor should be considered the owner, but this was contrary to form and bedeviled the judges in attempting to produce decisions which were consistent geometrically with precedent. In the late 1700's Lord Mansfield led the way among the law judges in considering the mortgagee's interest to be for security purposes only and not as an estate.[21] The law courts had had no difficulty in dealing with the non possessory lien interests of creditors established under the Statute Merchant and Statute Staple and subsequent similar acts,[22] but they seemed unable to draw the parallel to the interest of a mortgagee under an absolute conveyance subject to defeasance.

In the fifteenth century the Courts of Chancery, as a haven for oppressed mortgagors, began to develop procedures for requiring a reconveyance by mortgagees under circumstances evidencing fraud or duress by them, as well as conditions that indicated extreme hardship to the mortgagor unrelated to fault by the mortgagee. The movement was accelerated by what had become a somewhat common ploy by mortgagees who had exacted from their respective mortgagors a bond in double the amount of the debt to ensure payment at maturity.[23] In an action at law brought against him on the bond the mortgagor would not be permitted to introduce parol evidence of an agreement by the mortgagee to reconvey title to the mortgagor upon payment of the debt. From a smattering

---

20. *Anon. v. Anon.*, 3 Eyre of Kent (29 Seld.Soc. Pub.) 95 (1314).

21. *King v. St. Michaels*, 2 Doug. 630, 632, 99 Eng.Rep. 399, 400 (1781).
   "A mortgagee notwithstanding the form, has but a chattel, and the mortgage is only a security. It is an affront to common sense to say that the mortgagor is not the owner."
   In America Lord Mansfield was the most widely respected of the English law judges, an opinion not always shared in his home country.

22. DeMercatoribus 13 Edw. I (1285)
   DeStapulis 27 Edw. III, C.9 (1353)
   The statutes merchant and staples were designed to encourage merchants to sell on credit by giving them a non-possessory lien on all of the land of the purchaser. The buyer and seller would acknowledge the debt before a judge or

other court official, which would become a matter of record. The creation of a lien in favor of the merchant was an extension of the Statute of Action Burnell, 11 Edw. I (1283) and Writ of Elegit, 13 Edw. I, C.18 (1285) which for the first time caused freehold interests in land to be subject to execution for the payment of debt and provided a method of accomplishment. Subsequent statutes staple caused after acquired land to become subject to the non-possessory lien first discussed.

23. A double bond occasionally was used as a stratagem for disguising payment of interest. After default the mortgagor would forfeit a bond of double the debt, which was the equivalent of paying the debt and also interest in an amount equal to the debt.

of cases heard by himself in detail during the reign of Henry VI, the Chancellor increasingly delegated hearings to others to the extent that by 1625 it was no longer necessary to plead special circumstances, and any mortgagor who had failed to make full payment on maturity of the debt was given a period of time in which he could cure his default by making payment of the principal, interest and costs. This equitable right of redemption came in time to be called an "equity of redemption",[24] the transfer or assignment of which was recognized in Courts of Chancery. Opinions differed as to whether it was indeterminate or had a 20 year limitation similar to other adverse interests in property. In any event, as the right to redeem became practically automatic the Courts of Chancery recognized that the pendulum had swung too far.[25] Where equity required it, they would set a termination date, but shortly a standard procedure was established called a foreclosure, the only effect of which was to terminate, or foreclose the right of redemption. It did not otherwise affect the relationship between the two parties in any respect. It did not cause a sale, and it did not establish a deficiency.

## PART II

*TITLE THEORY AND LIEN THEORY*[26]

As stated previously, the conventional method of creating a mortgage in England after about 1350 was for the borrower to execute an absolute deed of conveyance to the lender, subject to a defeasance in favor of the borrower in the event that the debt was paid at maturity. The same method was used in America during the Colonial period and after independence.

Since independence there has been a considerable divergence in the way that mortgages have been interpreted in the several states.[27] Although not using Civil Law argument or precedent, a plurality of the states have arrived at a similar result; namely, that regardless of the form which the conveyance may take, a mortgage essentially is a security interest, and not an estate. With respect to the minority of the states it is only possible to declare what the last positions of record have been where the form of mortgage has been an absolute conveyance or other form of deed. It is not possible to postulate with supporting authority what their positions would be if the form of the mortgage transferred only a security interest. For a variety of reasons the position of a mortgagee *vis a vis* the mortgagor and also in relation to other creditors is stronger if he is considered to have an ownership interest in the property rather than just a security interest.

A simple syllogism explains why that is. Ownership carries with it possession, and possession carries with it rents. At com-

---

24. It was first described as an "equity of redemption" in *Duchess of Hamilton v. Countess of Dirlton*, 1 Ch.R. 165 (1654).

   This redemption procedure had been anticipated by at least 400 years in the Jewish mortgages, which permitted redemption within one year and one day.

   Another type redemption had been authorized in the law courts before Edward I caused procedures to become more stringent in the thirteenth century.

25. It is not clear why redemption did not redevelop in the courts of law after the enactment of 7 Geo. III, c.20 (1734), which provided that in an action in ejectment the mortgagor could establish his title upon payment of the principal, interest and cost of suit.

26. Edgar N. Durfee, *The Lien or Equitable Theory of Mortgages—Some Generalizations*, 10 Mich.L.Rev. 587–607 (1912).

   William H. Lloyd, *Mortgages, The Genesis of the Lien Theory*, 32 Yale L.J. 233–246 (1922).
   Sturges and Clark, *Legal Theory and Real Property Mortgages*, 36 Yale L.J. 691–719 (1928).
   Wm. F. Walsh, *Development of Title and Lien Theories of Mortgages*, 9 N.Y.U.L.Q.Rev. 280–309 (1932).

27. No doubt influenced by Lord Mansfield, South Carolina in 1791 passed an act establishing a simple foreclosure procedure, which provided,

   "that no mortgagee shall be entitled to a possessory action for the real estate mortgaged, even after the time alloted for the payment of the money secured by the mortgage is elapsed, but the mortgagor shall still be deemed owner of the land and the mortgagee as owner of the money lent or due."

mon law the mortgagee had an immediate right to possession, which continues in some states but is not true in Illinois where the mortgagee does not have a right to possession until after default. The possession must be achieved by some peaceful means, usually the consent of the mortgagor or an action of ejectment. The basic difference between the title states and the lien states is that after default in a lien state the mortgagee must first institute a foreclosure proceeding to bring the title to him before he can exercise ownership prerogatives. In a title state the mortgagee can proceed immediately to effectuate his existing right to possession.

Pomeroy, Jones and Walsh [28] have analyzed the statutes and decisions in the states other than Alaska and Hawaii and have made classifications in which they agree on 35 states and either disagree or express no opinion on the remaining 13. Of the 35 on which there is agreement the authors categorize 16 as "title" or common law theory states, which signifies that the courts of those states would hold that a mortgage deed conveys some form of title to the mortgagee. In the 19 "lien" or equity theory states a mortgage deed would not convey title to the mortgagee. All of the writers consider Illinois to be a title theory state. Kratovil creates a sub-classification of the latter, which is called "intermediate" state, that is, a title theory state which does not permit the mortgagee to maintain an action of ejectment prior to default. Illinois, New Jersey, North Carolina, and Ohio are intermediate states under this nomenclature.

The reasons that a majority of the states adopted a lien theory are sociological and pragmatic as much as they are legal. All of the states west of the Mississippi River, with the exception of Arkansas, are classified by one or more writers as being lien theory states. By and large the residents of the Western and Southern states have been debtors in relation to the Eastern financial districts of Boston, New York and Philadelphia, and a debtor-oriented mortgage philosophy is as predictable as a debtor-oriented exemption and homestead philosophy. At the time of their admissions to the Union, these states were undeveloped, with lawyers and judges less trained than those of the East and of England and drawn frequently from middle and lower classes instead of upper classes and nobility. Many of the states were not able to afford the dual system of law and Chancery Courts, with the result that law courts had a broader outlook than they might have had otherwise. The courts that did exist were few, far apart and practical. Code pleading had just been introduced in the East and was copied widely.

■ No purpose would be served by a general discussion of the lien theory, but it may be in order to remark that the word lien is one of the most loosely and excessively used terms in the law, with many different meanings. Mr. Justice Erle described it as being "intensely undefined." [29] Judge Learned Hand considered it "surely the most comprehensive of words." [30] Although at common law liens generally were possessory, the liens authorized by the statutes merchant and staple were non-possessory,[31] as are present day mechanic's liens and judgment liens. A lien which is neither possessory nor recorded can present opportunities for defrauding innocent third parties. Because mortgagors normally maintain possession of the mortgaged premises, mortgagee's liens are non-possessory but continue to protect the mortgagee if recorded. As used in the Bankruptcy Act and the Bankruptcy Reform Act the word "lien" is all encompassing.

---

28. Op.Cit. Note 4, supra, Pomeroy, §§ 1187, 1188;
Op.Cit. Note 4, supra, Jones, §§ 18–68;
Op.Cit. Note 26, Walsh, at p. 303;
Op.Cit. Note 4, supra, Kratovil, § 407;
R. Kratovil, *Modern Mortgage Law and Practice*, § 294, Prentice-Hall, Inc. (1977).

29. *Brunson v. Allard*, (1859 Q.B. 2 El. & El. 19).

30. *In re Lake's Laundry, Inc.*, 79 F.2d 326 (2 Cir. 1935).

31. Op.Cit. Note 22, supra.

### POSSESSION AND ENTITLEMENT TO RENTS [32]

During that long period of time when all rents from property mortgaged in a living gage were required to be used to reduce the mortgage debt, it did not matter materially whether the mortgagor or the mortgagee maintained possession because the rents would be used in the same manner in either event. Nevertheless, it generally has been accepted that whichever of them had possession was entitled to the rents. Thus the question usually posed is not "Who is entitled to the rent?" but rather "Who is entitled to possession?"

For more than three hundred years the universal custom has been for the mortgagors to maintain possession and consequently to collect the rents. A change which did take place during this period was that use of the collected rents became unrestricted instead of being restricted to a reduction of the debt, which substantially increased the mortgagee's exposure to loss. As a means of compensating for the added risk a common usage developed in mortgages covering commercial property of having the rents assigned to the mortgagee as an additional security. The pattern of these rent clauses, however, was that they did not become functionally operative until default. They were almost universally construed as providing a second source of payment of the debt not to be used, however, until it had become established that the land itself did not have sufficient value to repay the debt.

■ It is in that sense that Illinois courts have considered rent clauses. *Levin v. Goldberg* [33] and *Stevens v. Blue* [34] are the latest in a series of Illinois cases which hold

that by itself a rent clause does not give the mortgagee a lien on rents. It is implicit in the decisions that if the mortgagee had taken a second step and had taken possession or had had a receiver appointed, then the mortgagee would have had a prior claim to prospective rents collected after the taking of possession or constructive possession.[35] A rent clause might be compared to an invitation to attend a party. If the mortgagee takes some action and attends the party, he obtains special rights. On the other hand if he does not attend the party, his rights are no greater than those of persons who were not even invited. After default if a mortgagee takes action and a deficiency is apparent or develops, he may obtain a first claim on the rents. If he does not take action, however, he normally has no greater interest in the rents, than a general creditor.

### ILLINOIS LAW

Pomeroy, Jones and Walsh have classified Illinois as a "title" theory, or common law theory, state. Kratovil calls it an intermediate state because the mortgagee may not maintain a possessory action prior to default.[36] All of the writers base their classifications upon the assumption that the mortgage instrument is one by which title is transferred, i. e., it is some form of deed. Two forms of deed have been used commonly in the mortgage field in Illinois. One is an absolute conveyance subject to defeasance upon timely payment of the debt. This is similar to the conveyance which has been used in England for the last 600 years and not unlike that used by the Jews for several centuries before that, except that

**32.** Morris Berick, *The Mortgagee's Right to Rents*, 8 U. of Cinn.L.Rev. 250–299 (1934).

Note: *The Mortgagee's Rights to Rents after Default*, 50 Yale L.J. 1424–47 (1941).

Note: *The Mortgagee's Rights to Rents and Profits Following a Bankruptcy*, 60 Iowa L.Rev. 1388–1400 (1975).

"Rents" is used in the historical discussion, as it is customarily, in the generic sense of emblements, including severed crops, proceeds from the sale of crops, timber, minerals, cattle, and other income or profit from the mortgaged premises. From the context it should be clear

that in modern business situations "rents" has its commonly accepted meaning. Rent clauses usually define their own scope.

**33.** 255 Ill.App. 62 (1929).

**34.** 320 Ill.App. 375, 51 N.W.2d 603 (1943).

**35.** E. D. Grigsby, *Illinois Real Property Law and Practice*, §§ 933–935, 979–981, Burdette Smith Company (1948).

**36.** Op.Cit. Note 28; supra.

here the conveyance and defeasance are in a single document, both made by the grantor, a combination which developed in England about 1500. The second form of deed is a trust deed by which title is passed to a trustee whose described functions are not unlike those which would be performed by an agent of the mortgagee.

The treatises do not discuss what the situation would be if the mortgage document employed should convey only a security interest, but the answer seems quite obvious. If title is not transferred, those rights which are attributable to ownership will not be transferred either. There has been no reported case in Illinois which deals with the possessory rights of a mortgagee whose interest is derived from a mortgage, rather than from a deed. Consequently, this question must be considered as a matter of first impression because the mortgage instrument here under consideration is a mortgage and not a deed.

The latest Illinois Supreme Court decision on the possessory rights of a mortgagee is *Rohrer v. Deatherage*,[37] which upheld the title theory but stated it in the obverse because of the nature of the issue before the Court, "In this State a mortgagor is the legal owner of the mortgaged premises against all persons except the mortgagee." The language of the decision is consistent with other Illinois cases going back for more than a century.

Subsequent Appellate Court cases follow the same line of reasoning and either disclose that the mortgage instrument is a deed or remain silent on the nature of the document. The *Rohrer* language is almost identical to that which had been used 70 years earlier in *Hall v. Lance*.[38]

■ It cannot be emphasized too strongly, however, that all of these decisions are based upon mortgage instruments which were deeds of conveyance and that no Illinois court has stated what the interest of a

mortgagee would be if the mortgage instrument was, in fact, a mortgage. We now hold that in the instant case as a matter of Illinois law all that the mortgage transferred to the mortgagee was a security interest in the premises to pay the debt represented by the note.

## POSSESSION AND FORECLOSURE STATUTES

The preceding portions of this opinion dealt primarily with theory and with what the Illinois case law was with respect to the right to possession of mortgaged realty by the mortgagee. Rather extensive legislative changes were made in 1961 relating to possession by a mortgagee and to foreclosure procedures which have not received court construction in the areas germane to us. Sections 9 and 10 of the Illinois Mortgage and Foreclosure Act[39] describe the legislative intent and indicate that the purposes of the package of legislation were primarily to establish efficient procedures and revise periods of limitation and not to make changes in substantive law.[40] To be more specific the acts established the procedures which would be followed when a mortgagee filed a foreclosure action and the steps which would be taken in that proceeding to place the mortgagee in possession, but they did not deal with the substantive question of the circumstances under which a mortgagee would be entitled to possession prior to the institution of suit. That would appear to have remained unchanged, so that to the extent that the classifications by the pundits of Illinois as a title state or an intermediate state were accurate prior to the legislation, the labels would continue to be applicable afterward.

The reason for the qualification in the preceding sentence and questioning of whether title state and intermediate state are properly descriptive of Illinois law in 1980 is that although there have not been

37. 336 Ill. 450, 454, 168 N.E. 266, 268 (1930).

38. 25 Ill. 277 (1861).

39. 1977 Ill.Rev.Stat. Ch. 95, Secs. 23.8 and 23.9.

40. Frank C. Bernard, *Legal Aspects of 1961 Mortgage and Redemption Law Legislation in Illinois*, 43 Chi.Bar.Rec. 225, 232–235 (1962). Op.Cit. Note 51, infra.

any recent court decisions, Illinois real property law has undergone a good bit of modernization since the *Rohrer* case in 1930. In 1933 a real estate business could be conducted by a corporation for the first time; [41] in 1933 Illinois adopted code pleading; [42] in 1953 Illinois abolished the Rule in Shelley's case; [43] in 1955 it abolished the Doctrine of Worthier Title; [44] and in 1975 it abolished dower and curtesy.[45] (It had eliminated entailment [46] and livery of seisin [47] in 1872). In consideration of these changes and the shift toward a lien theory in other states, it would be surprising, if the Illinois Supreme Court ever again should face an absolute conveyance subject to defeasance, to see that Court hold that the deed did pass title to the mortgagee and not just a security interest. In fact, it is rather doubtful that an absolute conveyance as a mortgage device will ever reach the Illinois Supreme Court again.

That case, however, is not before us. We are considering a situation where the form of the document did not cause title to pass, and the intent of the parties was that title should not pass. We hold that as a matter of Illinois law title did not pass to the mortgagee. As a lienholder the mortgagee was entitled to file a foreclosure action, seeking possession and the appointment of a receiver, which it did. The Illinois Court had not granted either request at the time that the Chapter XII petition was filed in the instant case. Further proceeding in the Illinois Court was stayed by Bankruptcy Rule 12–43, the modification of which was not pressed in this Court.

### *BUTNER v. UNITED STATES* [48]

The parties argued the *Butner* case at length in their oral presentations and in their briefs on the issue of whether that decision should be applied retroactively (that is, control the instant case) or prospectively (that is, apply only to cases filed after the decision date of February 21, 1979). *Butner* represents a resolution by the Supreme Court of a conflict between the Circuits with the Second, Fourth, Sixth, Eighth and Ninth holding the view that the Federal Courts are obliged to enforce the applicable state law on the question of whether a security interest in mortgaged property extends to the rents and profits to be derived from the property. The Supreme Court described the other half of the conflict as follows:

> "The Third and Seventh Circuits have adopted a federal rule of equity that affords a mortgagee a secured interest in the rents even if state law would not recognize such interest until after foreclosure."

If the Third and Seventh Circuits had adopted a federal rule of equity, the one described above was not it. All of the cases in both circuits arose in either Pennsylvania, New Jersey, or Illinois, all of which are title states. In title states foreclosure is unnecessary because the mortgagee already has title. Foreclosure proceedings are an acceptable method to obtain possession in these states, but ejectment would serve the purpose and may be more convenient. In lien theory states foreclosure generally is necessary because the mortgagee has to obtain a title upon which he may found his claim for possession.

The Supreme Court cites four cases to support the above quoted "federal rule of equity" theory. The three from the Third Circuit will be discussed first. *In re Pittsburgh-Duquesne Development Co.* [49] and *Central Hanover Bank & Trust Co. v. Phila-*

---

**41.** 1977 Ill.Rev.Stat. Ch. 32, Sec. 157.5(d). The absence of this power is the reason for Chapter XII. See: Merrick and Bufithis, *Chapter XII Why is it?*, 52 Am.Bank L.J. 213–257 (1978).

**42.** 1977 Ill.Rev.Stat. Ch. 110, Secs. 1–94.

**43.** 1977 Ill.Rev.Stat. Ch. 30, Sec. 186.

**44.** 1977 Ill.Rev.Stat. Ch. 30, Sec. 188.

**45.** 1977 Ill.Rev.Stat. Ch. 110½, Sec. 2–9.

**46.** 1977 Ill.Rev.Stat. Ch. 30, Sec. 5.

**47.** 1977 Ill.Rev.Stat. Ch. 30, Sec. 1.

**48.** 440 U.S. 48, 53, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979).

**49.** 482 F.2d 243 (3 Cir. 1973).

delphia & Reading Coal & Iron Co. [50] rely on Bindseil v. Liberty Trust Co. [51] The court in Bindseil clearly thought that it was following decisions of the Pennsylvania Supreme Court in Bausman's Appeal [52] and Wolf's Appeal [53] and that In re Industrial Cold Storage & Ice Co. [54] and In re Torchia [55] had also. The latter two cases are cited in Collier as examples of applicable state law giving an equitable right to rents to a mortgagee; "Both of these cases were based on Pennsylvania law." [56] The reasoning in both of those cases is somewhat difficult to follow, Industrial Cold Storage because in a bankruptcy setting the District Court was attempting to follow simultaneously two non-bankruptcy decisions which were not entirely consistent, Freedman Savings & Trust Co. v. Shepherd, [57] from the United States Supreme Court, and Wolf's Appeal from the Pennsylvania Supreme Court.

As we read the opinion in In re Wakey, [58] the Seventh Circuit case cited in Butner for advocating a federal rule of equity, the Seventh Circuit thought that it was applying Illinois law but became confused on the differences in duties between a trustee in bankruptcy, a receiver in a state foreclosure, and a federal equity receiver and thought that the duties of a trustee, with which it was not familiar, were the same as those of a federal equity receiver.

The facts in the Wakey cases were that the mortgagor became bankrupt at a time when the mortgage was not in default. The default occurred through the failure of the trustee in bankruptcy to continue payments to the mortgagee. The mortgagee did not take any steps to exercise his rent clause and could not have taken any state court action because of the pendency of the

bankruptcy case. Due to the fact that the mortgaged property was a source of the estate which was being generated by the trustee in bankruptcy for the general creditors, it would have been an acceptable bankruptcy practice to have paid interest on the mortgage as an alternative to authorizing foreclosure.

The first place where the Seventh Circuit slipped into the mire was in not recognizing that the bankruptcy proceeding was the cause of the default and that the mortgage was current when the bankruptcy case was filed. Under such a set of facts the mortgagee could not have instituted a foreclosure proceeding prior to the bankruptcy because the mortgage was not in default and at that time there was no basis for foreclosure. The court got bogged down further when it assumed that the existence of a bankruptcy proceeding excuses a mortgagee from pursuing his rights.

The question of what action must be taken by a mortgagee to activate his right to rents is more readily answered by using a philosophical than a case by case analysis. The goal is to arrive at a result which will solve a broad range of problems without creating additional new problems. As a starting point a mortgagee should be chargeable only with those rents which he has an ability to collect. Also he should have a liability only for matters over which he has control. This kind of reasoning seems to underlie Marcon v. First Federal Savings and Loan Association, [59] where the court held that actual possession was the criterion for a mortgagee's liability. We believe the Illinois law to be that the reverse side of the coin is also true. Actual possession is the criterion for a mortgagee's rights.

**50.** 99 F.2d 642 (3 Cir. 1938).

**51.** 248 F. 112 (3 Cir. 1917).

**52.** 90 Pa. 178 (1879).

**53.** 106 Pa. 545 (1884).

**54.** 163 F. 390 (E.D.Pa.1908).

**55.** 188 F.2d 207 (3 Cir. 1911).

**56.** Collier on Bankruptcy, § 70.16 n. 38, 14th Ed. Matthew Bender Incorporated (1978).

**57.** 127 U.S. 494, 8 S.Ct. 1250, 32 L.Ed. 163 (1888).

**58.** 50 F.2d 869 (7 Cir. 1931).

**59.** 58 Ill.App.3d 811, 16 Ill.Dec. 253, 374 N.E.2d 1028 (1978).

It has been suggested in the mortgagee's brief in the instant case that the filing of a mortgage foreclosure proceeding and requesting the appointment of a receiver should be a sufficient action on the part of the mortgagee.

Putting that theory to the litmus test we find that it is unworkable. Looking at the general situation in Illinois, we find that the time interval between the filing of a foreclosure petition and the termination of the statutory right of redemption may be as long as two years, during all of which time the mortgagor ordinarily is able to maintain possession and collect rents without any accountability for the rents collected, unless he consents to surrender possession or there is an order placing the mortgagee in possession or appointing a receiver.

A mortgagee in possession, on the other hand, ordinarily is accountable for the rents because the rent clause is considered additional security for payment of the debt and not a separate independent security. If the mortgagee should be deemed to have been placed in possession when he filed the foreclosure petition, he would be accountable for two years of rents which he did not receive, to be used to reduce the debt. If the mortgagee were deemed to be in possession he might have a liability for a wide variety of losses over which he had no control. Complexities already difficult would become almost overwhelming if he were deemed to be in possession for certain purposes and deemed not to be in possession for others. The tenants would be in a quandary as to whom to pay rents and to whom to present operating problems.

Deeming the mortgagee in possession assumes a successful foreclosure; one can hardly imagine the extent of the complications if the petition should be withdrawn, or dismissed, or defeated. The only practical solution is to have a cut off date which is definitive and recognizable. It can be a surrender of possession, it can be an order of court, but it must be something that is open, notorious and recognizable.

The 1961 Act unofficially headed Right of Possession of Realty after Default,[60] while in the drafting stage, called for an automatic placing of the mortgagee in possession upon the filing of a foreclosure petition. As enacted, the law provides that the mortgagee may be placed in possession upon his own application, without hearing unless there is an objection. The presumed reason for the change was the thought that frequently the mortgagees will not want possession if they have to take the burden of operation along with the benefit of rents.[61]

In the instant case the foreclosure petition was filed November 5, 1976. The Chapter XII case was not filed until June 29, 1977, and we have no evidence that during that eight-month period the mortgagee ever requested that it be placed in possession. The request for the appointment of a receiver is a part of the statutory form of a foreclosure complaint. We have no evidence that the mortgagee ever urged such an appointment.

■ We hold that the Illinois law is, and for some time has been, that the mortgagee must be in actual possession in order to be entitled to rents.[62] We hold that to be the federal law also after *Butner.* Before *Butner* the federal court would have recognized that for nineteen months the mortgagee might have had the right to the rents if it had been willing also to accept the burdens. Assuming that the Seventh Circuit felt that there was a federal rule of equity prior to *Butner,* it would not after a nineteen month period of indecision, lassitude, inactivity or whatever, on the part of the mortgagee, award a portion of the benefits of posses-

---

60. Op.Cit. Note 1, supra.

61. R. Kratovil, Mortgages—*Problems in Possession, Rents and Mortgagee Liability*, 11 DePaul L.Rev. 1–26 (1961).
    Op.Cit. Note 40.

62. As used here actual possession is intended to include actual possession by the mortgagee and any of his agents as well as a receiver appointed with power to collect rents. This possession would commence with the entry of an appropriate order of court and would not be dependent upon physical presence on the premises.

sion retroactively; the counter-balancing burdens could not be directed retroactively because they had been performed.

It is immaterial whether *Butner* applies to this case or does not. Both before *Butner* and afterward a federal court would arrive at the same conclusion as an Illinois court. It is insignificant that before *Butner* the two courts might have taken different routes. During the Chapter XII proceeding the mortgagee might have moved under Bankruptcy Rule 12–43(d) to modify the stay, permitting it to proceed in the foreclosure court, or it could have requested a receiver in the Chapter XII proceeding.

## ABSOLUTE ASSIGNMENT OF RENTS

In addition to the assignment of rent clause contained in the mortgage and discussed above, there was a separate absolute assignment of rents executed on the same day as the mortgage and the note, which was attached to the mortgage as an exhibit. Although expressed as a present assignment, it provided, in part,

".  .  . it is expressly understood and agreed, anything herein contained to the contrary notwithstanding, that the mortgagee shall not exercise any of the rights and powers conferred upon it herein until and unless a default shall occur in the payment of interest or principal due under the note secured by the above described mortgage .  .  ."

The assignment goes on to state:

"In any case in which under the provisions of the above described mortgage the mortgagee has a right to institute foreclosure proceedings, whether before or after the entire principal sum secured thereby is declared to be immediately due, or whether before or after institution of legal proceedings to foreclose the lien thereof, or before or after sale thereunder, forthwith, <u>upon demand of the mortgagee,</u> the undersigned agrees to surrender to the mortgagee and the mortgagee shall be entitled to take actual possession of the premises or any part thereof personally, or by its agents or attorneys, and mortgagee in its discretion may, with or without force and with or without process of law, enter upon and take and maintain possession of all or any part of the said premises .  .  ." (underscoring supplied).

It is not necessary for this Court to determine whether in the instant case the absolute assignment gave to the mortgagee any rights to rents additional to those provided by the rent clause and by the statute described above, for two reasons:

(a) The Complaint seeking relief does not request relief under the absolute assignment but only under the mortgage, and

(b) The absolute assignment is not self-executing but requires a demand by the mortgagee after default. There is no evidence that any such demand ever was made.

## STATEMENT OF FACTS

For ease of exposition we shall refer to the parties in interest as mortgagor and mortgagee, although each of them is several steps removed from the original contracting parties.

Mortgagor: Michigan Avenue National Bank of Chicago, an Illinois bank with trust powers, as trustee of Trust No. 2144 and No. 2244, is the mortgagor. The beneficial owner of Trust No. 2144 is a limited partnership of which Robert L. Cook is the general partner. That trust owns the fee to a parcel of land in Summit, Illinois, on which has been constructed Summit Plaza Shopping Center. Trust No. 2244 has a long term lease from Trust No. 2144 and is the operator of the shopping center. The beneficial ownership of Trust No. 2244 is held by Lockport Land Company, a limited partnership of which Cook, Stratton and Company is the general partner. That company is owned by Robert L. Cook.

Mortgagee: The original mortgagee was Percy Wilson Mortgage and Financial Corporation, a Chicago mortgage broker, which assigned its interest to State Farm Insurance Company. After the

mortgagor had defaulted, State Farm sold its interest to E. N. Maisel and Associates, which holds title to the mortgage in the name of one of its employees, Marion August.

Summit Plaza Shopping Center consists of about 100,000 square feet of retail store space and associated parking areas. Its own financial troubles are a direct result of the insolvency of W. T. Grant Company (hereinafter "Grant"); Grant was the anchor tenant of the shopping center with 50,000 square feet. Because of its own problems which reached a climax after the 1973–74 recession, Grant filed a petition for reorganization under Chapter XI, as a part of which it reduced its national operations, including closing the store at Summit Plaza. The consequent loss of rental income produced severe financial problems for the mortgagor.

At various times during the summer of 1976 the mortgagor defaulted on its payments on the mortgage note, and on November 5, 1976, the mortgagee filed foreclosure proceedings in the state court. On June 29, 1977, the mortgagor filed the instant Chapter XII proceeding, which brought to a halt all action in the foreclosure suit due to the injunctive force of Bankruptcy Rule 12–43. Several motions to dismiss this proceeding were filed, argued, briefed and denied. During the eleven months that the case was active rents from the shopping center were used by the mortgagor to defray the operating expenses of the shopping center.

From the outset it was clear that new capital would not become available to fund a plan of reorganization and that if the debtor could be rehabilitated, the funding of the plan would have to be financed by profits generated internally by the operation of the shopping center. The keystone to a successful operation of the center necessarily was going to have to be obtaining one or more tenants for the vacant 50,000 square feet at a compensatory rent level. The cash flow shortage of the operation precluded incurring the expense of leasehold improvements to accommodate subdividing the 50,000 square feet into smaller units. Due to a general surplus of shopping center rental space in the Chicago suburban area resulting from an over-expansion of this type real estate speculation in the early 1970's, no success was achieved in obtaining a satisfactory tenant after nearly one year of searching. With no realistic prospects of an early success, the Court dismissed the case on June 5, 1978 for failure to file a plan.

The June 5 order of dismissal provided in pertinent part as follows:

". . . It is further ordered that this Court reserves jurisdiction over all funds in possession of the debtor in possession including, but not limited to, impressed funds pending further order of the Court."

There is in this district a local rule which requires a Chapter XI debtor in possession to file a bi-weekly report of cash receipts and disbursements and a monthly report of income and expenses. Commonly debtors in possession in Chapter XII proceedings are required to file similar reports, and such was the situation here. The debtor in possession filed the appropriate reports through April 30, 1978, but has not filed a report for the final five weeks of its operation, nor has it filed a final report. After the June 5, 1978 dismissal the mortgagee filed an application to be reimbursed to the extent of $20,000 for the attorney's fees which it had paid previously in connection with this proceeding.

On April 30, 1978, the cash account of the debtor in possession held $35,098.60, all of which represents a net collection of rentals from the shopping center, collected since the institution of the Chapter XII proceeding.

As discussed earlier the mortgage document was a mortgage and not a deed. It contained a rent clause, but the mortgagee did not gain possession of the premises nor achieve the appointment of a receiver. In addition, there was an absolute assignment of rents which did not become operative until a demand for possession was made, and no such demand was made.

The complaint of the mortgagee seeks an accounting and also the payment to it of all net rents.

## FINDINGS OF FACT AND ORDER

■ (a) With respect to the absolute assignment of rents the Court finds that the mortgagee did not at any time enter upon and take possession of the premises or in other manner activate its rights under that agreement;

(b) the Court also finds that the state court did not appoint a receiver and did not award possession of the premises to the mortgagee;

(c) the Court also finds that the mortgage instrument at issue herein is a mortgage and not a deed and that under applicable Illinois law title did not pass to the mortgagee;

(d) the Court also finds that the debtor has not completed filing its accounting for its activities;

(e) the Court also finds that the attorney for the debtor has not filed an application for attorney's fees;

(f) the Court also finds that the mortgagee has no interest in residual funds after payment of all expenses of administration;

(g) the Court also finds that by its order of June 5, 1978 it retained jurisdiction to dispose properly of all unfinished aspects of the case.

THEREFORE, IT IS ORDERED HEREBY that by February 15, 1980:

(a) the former debtor in possession shall file a report in regular form of its accounts from May 1, 1978 to June 5, 1978;

(b) the former debtor in possession shall file a report of its accounts from June 6, 1978 to December 31, 1979;

(c) the attorney for the former debtor in possession shall file an application for such fees as he may deem appropriate, including retainers and other fees previously received; and

(d) the former debtor in possession shall file its objections, if any to the application of the mortgagee for reimbursement for attorney's fees previously paid.